IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent/Cross-Appellant,<br><br>v.<br><br>JORDAN MICHAEL STENGRUND,<br><br>    Appellant/Cross-Respondent. | No. 85841-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Jordan Stengrund appeals his rape in the third degree conviction following a jury trial. The central issue at trial was whether the sexual contact was consensual. Stengrund challenges the exclusion of several sexually explicit photos of the victim. He also contends the rape shield statute, RCW 9A.44.020, is unconstitutional facially and as applied to him because (1) requiring Stengrund to file a pretrial motion supported by an affidavit in order to introduce evidence is one-sided and violates his due process rights and his right to remain silent; and (2) it mandates the trial court to close the courtroom, which it did even during discussion of exhibits that had nothing to do with the victim's sexual history. Stengrund also asserts that the trial court erred, under ER 404(b), by allowing the victim to testify that she believed Stengrund created a fake Instagram account. Lastly, he makes several claims of prosecutorial misconduct, and claims his trial counsel was ineffective.

We conclude that the trial court erred in allowing the victim to testify that Stengrund created a fake Instagram profile to communicate with her, but the error was harmless. We accept the State's concession that the prosecutor improperly suggested Stengrund was coached by defense counsel. We agree with the State that the error is waived because Stengrund failed to object and the one-time statement was not so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. Stengrund's ineffective assistance of counsel claim also fails because he does not show how he was prejudiced. Stengrund's remaining claims are either waived or lack merit. We affirm.

FACTS

Jordan Stengrund and N.A. began dating in October 2018. Their relationship lasted several months and included periods of being on and off. They disagree as to the nature of their sexual relationship and when it ended. Stengrund's conviction is based on him having anal sex with N.A. in March 2019. N.A. testified they never had previously engaged in anal sex. N.A. said their relationship ended in January 2019, but they stayed in contact as friends only. Stengrund testified that there were several consensual sexual encounters, including anal sex, between them through February and March.

According to N.A., Stengrund asked to stop by her home on March 17, which she agreed to. N.A. was planning to attend a concert that night and declined to tell Stengrund who was going with her. When N.A. did not feel well she curled up on her side on her bed. N.A. repeatedly rejected Stengrund's verbal and physical requests (pulled her sweatpants down) to have sex by saying "no" and pulling her sweatpants

back up. N.A. said she then froze and Stengrund shoved his penis into her anus and ejaculated. N.A. testified that she stood up, pulled up her sweatpants and told Stengrund, "you basically just raped me." N.A. said Stengrund asked if she was going to tell anyone and N.A. told him she would not but that is what happened.

Stengrund testified his relationship with N.A. was on in February and early March. He introduced photographs during that time frame, including photographs of N.A. in her bra and underwear that Stengrund took of her one evening while they were in her room. He also introduced text messages between the two about getting together, snuggling, being in love and missing each other. Stengrund testified that the anal sex that is the subject of N.A.'s claim occurred on March 10 when he woke up after a night of drinking, cuddling and sex, including anal sex. He said N.A. had consented verbally and physically to having sex the prior evening. The next morning, Stengrund said N.A. rubbed up against him, they started to make out, and she asked him to grab lubrication, the same thing she did the night before. Stengrund claimed N.A. never indicated to him that she did not want to have sex. He denied N.A. immediately accused him of rape. He testified that she made that claim by text later in the day.

After the incident, Stengrund sent N.A. several text messages. On March 21, Stengrund wrote:

> Got it. Im sorry for how things went im sorry for how they ended and for what happened. I should have listened to you and to your body language and not assumed anything. I talked about it at therapy and I understand what happened more clearly and i was in the wrong and I did what i wanted without regard for how you felt or would feel after. And just because you were into someone one time or at a different point doesnt make it okay to assume youre okay with it at a different time. I was wrong, i acted selfishly and i hurt you and scared you and i am sorry for that. I am sorry for what i did. My actions were not correct and while my intentions were not malicious or meant to cause you pain or this feeling or anything

> negative i still acted out of a sexual satisfaction and that was wrong. I am
> sorry. I hope that you will be okay, i learned my lesson and i understand it
> now and why it happened and I will continue to seek help on the situation
> to make sure I dont repeat myself ever again. I will leave you be and you
> will not have to see or hear from me again. I am truly sorry for everything

But Stengrund continued to text N.A. over the next five months. N.A. did not respond to several of the text messages. On March 29, Stengrund sent an image of a woman wearing what appears to be a thong in the driver's seat of a car while pulling up a pair of jeans. Stengrund suggested N.A., who models, do a shoot like that. N.A. responded, "I told you to delete my number and never talk to me again. Do you not realize what you did to me?! You're lucky I'm being the way I am about it so leave me alone and delete everything you have relating to me." Stengrund responded that "[he] understand[s] we were messing around and i went further than i should yes," while offering an apology. In April 2019, Stengrund sent N.A. a picture of a unicorn store, via text message. N.A. responded the following day, warning Stengrund that he was "one text away from me going to the police and getting a restraining order. Leave me alone." He responded stating that he had deleted all pictures of her, but wanted to know if it was ok for him to show up at a car meet where N.A. was scheduled to model. Stengrund continued, stating that he didn't want any problems by showing up to the car meet and respected N.A.'s wishes not to be contacted, but because he had been blocked on all other means of communication, "this is my only way to communicate so it is 100% out of respect." N.A. had blocked Stengrund from her Instagram, Facebook, and Snapchat accounts. N.A. responded:

> If you see me anywhere, you better act like you dont know me. Dont say
> shit to me or about me. We dont know each other, we don't need to be
> civil. I'm going to let you know one more fucking time. DO NOT contact me
> for any reason or I will get a restraining order.

N.A. told her sister and, later, her mother about the rape but did not report the rape to Kirkland Police until July 2020.[1] An officer took photographs of the text messages Stengrund had sent N.A. Because the incident took place in Seattle, Kirkland police forwarded the report to the Seattle Police Department

At some point after N.A. blocked Stengrund from contacting her, she received a connection request on Instagram from a "Corey_vette." N.A. explained at trial that she had quite a few followers on social media and a lot of them would reach out to her. Corey_vette asked a lot of questions about her relationships and was focused on her then-boyfriend. N.A. told "Corey_vette" that she was taking her boyfriend to a casino in Anacortes for his birthday. This was the weekend around her boyfriend's birthday, which was September 29, 2020. While at the casino, Stengrund showed up to the casino at the same time she was there. N.A. testified that "he stared at me in a way where he knew that he got me. I will never forget the look on his face." It was at this point that N.A. concluded that "Corey_vette" was Stengrund, whose favorite car is a corvette.

PROCEDURAL HISTORY

The State charged Stengrund with rape in the third degree. Trial proceeded in July 2023. Pre-trial proceedings included highly contested motions to admit and exclude evidence. Relevant to this appeal, Stengrund moved, under ER 404(b), to exclude N.A.'s testimony that Stengrund created a fake Instagram account, which the court denied. Stengrund also moved to admit sexually suggestive photographs of N.A. that were taken after January 2019 but before March 2019. The court conducted multiple

---

[1] N.A. testified at trial that she thought she reported it to police in "July of 2020. Sorry, 2021." A Kirkland police officer confirmed at trial that the first report was taken in July 2020.

hearings under the rape shield statute, former RCW 9A.44.020 (2023), and allowed some photos but denied others.

At trial, Stengrund admitted he sent the introduced text messages to N.A. but explained that he was simply responding to N.A. asking for an apology because he wanted to give her what she wanted to hear so that he could move on with his life. He also admitted that he did see N.A. at the casino in Anacortes after N.A. had asked him to not contact her and that if he did see her in person to pretend like he did not know her. Stengrund explained that this is a casino he had frequented for 12 years including previously with N.A. Stengrund was not questioned about the "Corey_vette" Instagram account. Additional facts related to these motions are discussed below.

A jury found Stengrund guilty and the court sentenced him to eight months of confinement followed by 12 months of community custody and imposed a five-year no-contact order. The court granted Stengrund's motion to stay the execution of his sentence pending appeal, but ordered Stengrund to not have contact with N.A. as a condition for the stay. Stengrund appeals.

## DISCUSSION

Exclusion of Sexually Explicit Photographs

Under the rape shield statute, former RCW 9A.44.020(3)(a), Stengrund submitted an amended declaration in support of his motion to offer several photographs of N.A. taken in January of 2019 that N.A. sent him, which the State opposed. These were 1) a close up photograph of her vagina she sent via Snapchat;[2] 2) a picture of N.A.

---

[2] "'Snapchat' is a social media application allowing users to send messages or images to other users. The messages automatically disappear a few seconds after the recipient opens the message. The messages can be preserved if the recipient takes a screenshot of the message

in lacy undergarments as reflected in a mirror; and 3) photographs from a photoshoot that included pictures of her in her underwear and bra. Later, Stengrund also offered additional photographs of N.A., but without a supporting declaration. These photographs, taken on February 11, 2019, included N.A. in thong underwear posing in front of a mirror. Another photograph is of N.A. laying on her back on her bed with her hand in her opened pants. Defense counsel stated that Stengrund will testify that N.A. was masturbating before they had sex on February 11 and that Stengrund took the photograph.[3] Stengrund argued that the photographs would contradict N.A.'s claim to police that their relationship ended in December of 2018 or January of 2019, and that there was no subsequent sex, hugging, kissing, "nothing."

After a series of hearings, the court allowed the admission of photographs of N.A. in her underwear, but excluded the vagina and masturbation photographs. The court reasoned that defense met the threshold showing that the evidence is relevant because it tended to rebut the anticipated State's evidence through N.A.'s testimony that the sexual relationship had ceased for about two months without any intervening physical, sexual, or intimate acts until the date of the alleged rape. In balance, the trial court reasoned that admitting the vagina photograph allegedly sent to Stengrund on January 24, 2019, and the photographs of N.A. purportedly masturbating

> will create a substantial danger of undue prejudice. The Court finds that the lurid photographs of a vagina that N.A. supposedly sent on January 24, 2019 and of apparent masturbation on February 12, 2019, acts that occurred several weeks [before] the alleged rape, would tend to inflame the jury and confuse them that these acts, even if true, could be somehow relevant to the question whether N.A. consented to anal sex, which is very distinct from masturbating or sending a photo of one's genitalia.

or image." State v. Bartch, 28 Wn. App. 2d 564, 569 n.1, 537 P.3d 1091 (2023), review denied, 544 P.3d 29 (2024).

[3] According to Stengrund, this photograph was taken on February 12, 2019.

The State did not object to Stengrund himself testifying on direct about specific sexual acts during the alleged timeline in January to March 2019, which the court allowed. The court concluded that the admitted photographs will allow Stengrund to corroborate his account that he was present at N.A.'s home in an intimate setting, and had sex to refute N.A.'s account that she was never physical or intimate with Stengrund after mid-January 2019.

A trial court's decision to exclude evidence under the rape shield statute is reviewed for an abuse of discretion. State v. Cox, 17 Wn. App. 2d 178, 186, 484 P.3d 529 (2021). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Lee, 188 Wn.2d 473, 486, 396 P.3d 316 (2017). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." Ryan v. State, 112 Wn. App. 896, 899-900, 51 P.3d 175 (2002).

Former RCW 9A.44.020(2) prohibits a victim's past sexual behavior to be admitted on the issue of credibility and is inadmissible to prove the victim's consent, except as provided in subsection (3). Under that subsection (3):

> In any prosecution for the crime of rape ... or for an attempt to commit, or an assault with an intent to commit any such crime evidence of the victim's past sexual behavior including but not limited to the victim's marital behavior; divorce history; general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards; or, unless it is related to the alleged offense, social media account, including any text, image, video, or picture, which depict sexual content, sexual history, nudity or partial nudity, intimate sexual activity, communications about sexual

activity, communications about sex, sexual fantasies, and other information that appeals to a prurient interest is not admissible if offered to attack the credibility of the victim and is admissible on the issue of consent, except where prohibited in the underlying criminal offense, only pursuant to the following procedure:

(a) A written pretrial motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the past sexual behavior of the victim proposed to be presented and its relevancy on the issue of the consent of the victim.

(b) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.

(c) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and the hearing shall be closed except to the necessary witnesses, the defendant, counsel, and those who have a direct interest in the case or in the work of the court.

(d) At the conclusion of the hearing, if the court finds that the evidence proposed to be offered by the defendant regarding the past sexual behavior of the victim is relevant to the issue of the victim's consent; is not inadmissible because its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice; and that its exclusion would result in denial of substantial justice to the defendant; the court shall make an order stating what evidence may be introduced by the defendant, which order may include the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.

The rape shield statute also provides that

[n]othing in this section shall be construed to prohibit cross-examination of the victim on the issue of past sexual behavior when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior, but the court may require a hearing pursuant to subsection (3) of this section concerning such evidence.

RCW 9A.44.020(4).

Stengrund argues that the trial court violated his right to put on a complete defense by excluding the vagina and masturbation photographs of N.A. Stengrund argues that the excluded photographs would have impeached N.A.'s testimony

regarding the nature and timing of their relationship and supported his defense by showing a pattern of consensual sexual contact beyond the timeframe N.A. alleged.

The State argues that the trial court did not err in excluding the photographs. We agree with the State.

The admissibility of past-sexual-behavior evidence is within the sound discretion of the trial court. State v. Hudlow, 99 Wn.2d 1, 17-18, 659 P.2d 514 (1983) (citing State v. Blum, 17 Wn. App. 37, 46, 561 P.2d 226 (1977). "The exercise of discretion in balancing the danger of prejudice against the probative value of the evidence is also a matter within the trial court's discretion, and should be overturned only if no reasonable person could take the view adopted by the trial court." Id. at 18. The balancing test in RCW 9A.44.020(3)(d) is "roughly the equivalent of the standard stated in ER 403." Id. at 12. "The inquiry as to the relevancy of prior sexual behavior of the complaining witness must be whether, under ER 401, the woman's consent to sexual activity in the past, without more, makes it more probable or less probable that she consented to sexual activity on this occasion." Id. at 11.

In the instant case, the State introduced evidence in its case in chief tending to prove the nature of the victim's past sexual behavior. The State elicited from N.A. testimony that she and Stengrund never engaged in anal sex and that their sexual relationship ended in January 2019. However, even when defense can address the issue of past sexual behavior under RCW 9A.44.020(4), the court may require a hearing pursuant to subsection (3). Under subsection (3), the court still conducts a balancing test to determine if the evidence proposed to be offered by the defendant regarding the past sexual behavior of the victim is relevant to the issue of the victim's consent, if it is

10

not admissible because its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice, and whether the exclusion of the evidence would result in denial of substantial justice to the defendant. RCW 9A.44.020(3). The trial court conducted such a balancing test.

The court determined that the sexual conduct captured in the excluded photographs were different in nature to anal sex and taken several weeks before the alleged rape occurred, and thus were too remote to be relevant to the issue of whether N.A. consented to anal sex in mid-March. The court concluded that the admission of these photographs would create a substantial danger of undue prejudice. Specifically, the court reasoned that the exclusion of the most inflammatory photos would not result in denial of substantial justice to Stengrund.

Indeed, Stengrund moved to admit the photographs to rebut N.A.'s claim that their sexual relationship ended in January 2019. But the trial court granted Stengrund's motion to admit several suggestive photographs of N.A. in her underwear that was sent to Stengrund to corroborate Stengrund's testimony that the two continued to have a sexual relationship beyond January 2019. Thus, excluding the most inflammatory photographs under the rape shield statute did not result in a denial of substantial justice to Stengrund.

<u>Rape-Shield Statute Violation of Due Process</u>

For the first time on appeal, Stengrund argues former RCW 9A.44.020 violates his constitutional right to due process because of the "one-sided nature" of the required procedures under the statute. Specifically, Stengrund takes issue with former RCW 9A.44.010(3) which requires the defendant to make a written pretrial motion to the court

and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the past sexual behavior of the victim and its relevance on the issue of the consent of the victim. Stengrund argues this is one-sided because the statute does not require the State to do the same.

Generally, the failure to object at trial will operate as a waiver of the right to assert that error on appeal. State v. Fagalde, 85 Wn.2d 730, 731, 539 P.2d 86 (1975). An appellate court may refuse to review any claim of error which was not raised in the trial court. RAP 2.5(a); State v. O'Hara, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009) (citing State v. Lyskoski, 47 Wn.2d 102, 108, 287 P.2d 114 (1955)). However, the general rule that an assignment of error must be preserved includes an exception when the claimed error is a "manifest error affecting a constitutional right." RAP 2.5(a); Id. at 98. To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest, and (2) the error is truly of constitutional dimension. Id. at 98 (citing State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007)). "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice," meaning the asserted error had practical and identifiable consequences in the trial of the case. Id. at 99.

Stengrund concedes that he did not object to the trial court's application of the rape-shield statute during trial. And he makes no argument as to how the application of RCW 9A.44.020(3)(a) caused him actual prejudice. Notably, Stengrund completely ignores the application of discovery rules. See CrR 4.7. "The evident purpose of the disclosure requirement is to protect the defendant's interests in getting meaningful access to evidence supporting the criminal charges in order to effectively prepare for

12

trial and provide adequate representation." State v. Boyd, 160 Wn.2d 424, 432, 158 P.3d 54 (2007). Stengrund does not otherwise contend that the State violated discovery rules. Stengrund has not met his burden of establishing a manifest constitutional error and has waived this issue.

Public Trial

Stengrund also argues for the first time on appeal that former RCW 9A.44.020 violates his constitutional right to a public trial because if the trial court finds the offer of proof sufficient, "the court shall order a hearing out of the presence of the jury, if any, and the hearing shall be closed except to the necessary witnesses, the defendant, counsel, and those who have a direct interest in the case or in the work of the court." RCW 9A.44.020(3)(c). Because closing a courtroom to the public is a structural error, it may be raised for the first time on appeal. State v. Shearer, 181 Wn.2d 564, 569, 334 P.3d 1078 (2014).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a defendant's right to a public trial. State v. Whitlock, 188 Wn.2d 511, 519-20, 396 P.3d 310 (2017). We review whether a defendant's public trial right was violated de novo. Id. at 520.

"A public trial is a core safeguard in our system of justice." State v. Wise, 176 Wn.2d 1, 5, 288 P.3d 1113 (2012). "We have recognized that the right to a public trial serves to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." State v. Sublett, 176 Wn.2d 58, 72, 292 P.3d 715 (2012) (lead opinion); id. at 99 (Madsen, C.J., concurring). However, the right to a public

trial is not absolute. Wise, 176 Wn.2d at 9. "Courts have recognized that, while openness is a hallmark of our judicial process, there are other rights and considerations that must sometimes be served by limiting public access to a trial." Id.

We engage in a three-part inquiry to determine whether the right to a public trial has been violated, asking: "'(1) Does the proceeding at issue implicate the public trial right? (2) If so, was the proceeding closed? And (3) if so, was the closure justified?'" Whitlock, 188 Wn.2d at 520 (quoting State v. Smith, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014)).

Generally, Washington courts use the experience and logic test to determine whether a proceeding implicates the public trial right. Smith, 181 Wn.2d at 514. "Under the experience prong, we consider whether the proceeding at issue has historically been open to the public." Whitlock, 188 Wn.2d at 521. The logic prong asks "'whether public access plays a significant positive role in the functioning of the particular process in question.'" Id. (internal quotation marks omitted) (quoting In re Det. of Morgan, 180 Wn.2d 312, 325, 330 P.3d 774 (2014)). "If the answer to both prongs of the experience and logic test is yes, the public trial right 'attaches' and the trial court must consider the Bone-Club factors on the record before closing the proceeding to the public." State v. Wilson, 174 Wn. App. 328, 341, 298 P.3d 148 (2013). The experience and logic test allows the determining court to "'consider the actual proceeding at issue for what it is, without having to force every situation into predefined factors.'" State v. S.J.C., 183 Wn.2d 408, 431, 352 P.3d 749 (2015) (quoting Sublett, 176 Wn.2d at 73)).

Division Two recently addressed this very issue as a matter of first impression in State v. Hicklin, 26 Wn. App. 2d 177, 179, 527 P.3d 1183 (2023). Division Two held that

the rape shield hearing does not implicate the public trial right. Id. Division Two applied the experience prong of the experience and logic test and held that "historically, rape shield hearings have never been open to the public." Id. at 185. The "rape shield hearing is a particularly discrete and limited aspect of a criminal trial. Any admissible evidence continues to be subject to public scrutiny during the actual trial, which achieves the aims of the public trial right." Id. at 186. Also, "when necessary, the conduct of the attorneys and the court is subject to the scrutiny of the appellate process." Id. Stengrund maintains that Hicklin is not persuasive, but does not argue that the Hicklin court did not properly apply the experience and logic test.

We follow Hicklin.

Stengrund also argues that what took place in closed court was testimony about foundational matters – authentication of the time and date of certain photographs and texts, some of which had nothing to do with Stengrund's and N.A.'s sexual history. He further contends that the court allowed legal argument to continue without an order explicitly re-opening the courtroom.

The State argues that (1) proceedings that discuss the admissibility of the subject evidence related to N.A.'s prior sexual conduct fall properly within the rape-shield statute; and (2) if it did not fall within the statute, Stengrund fails to establish that the portion of the proceeding he challenges was conducted in a closed courtroom.

The relevant challenged proceeding occurred during trial on July 24, 2023 prior to Stengrund's testimony. The State requested that the court comply with the rape shield statute and conduct a hearing outside the presence of the jury for Stengrund to establish the foundation needed for the photographs the court was not already

excluding. The court agreed, reasoning that it was important to establish the foundational requirements initially outside the presence of the jury so the court could "prevent any photographs or discussion of photographs from confusing the jury in the evidence that they didn't come in ultimately due to insufficient foundation or inflaming them where the photographs might not come in." Outside the presence of the jury, but before closing the courtroom, the parties attempted to ensure that the exhibits were properly marked. While doing so, both the trial court and Stengrund's counsel referred to the subject matter of various photographs using the terms "vagina" and "selfie in lacy undergarments." The State then reminded the court to close the courtroom except for necessary witnesses prior to Stengrund's testimony to lay the foundation. The court did so. Stengrund then testified to having taken one of the photographs of N.A. while laying on her bed after having come over to stay the night during a snowstorm. Stengrund testified that the photograph is of N.A. "in her underwear in a tank top kind of posing in the mirror for me." Stengrund testified that in one of the photographs you can see snow outside on the trees. To establish when the photograph was taken, he introduced other snow photographs and text messages with family to establish evidence of a snowstorm during that time frame and his accuracy that the photographs of N.A. were taken in February 2019.

After Stengrund testified in the closed hearing, the court directed the parties that they could make final arguments after the lunch hour and that the court would make final rulings "outside the presence of the jury." The verbatim report of proceedings shows that court resumed about an hour later, argument was taken, and the court made its ruling as to the proffered photographs that were subject of the rape shield statute.

16

The State made additional hearsay arguments related to foundational exhibits Stengrund introduced during the closed hearing. Stengrund protested to having a pretrial hearing about his exhibits that were not photographs of N.A. The court responded

> These issues actually might be discussed outside the presence of the jury. It's not unusual to exclude the jury if we need substantive argument on hearsay or whatever. We're just using this conveniently as an opportunity to do that. This is not a rape shield hearing per se. It's just an opportunity to discuss things outside the presence of the jury which is done all the time.

After further argument and rulings, the trial court brought in the jury and trial resumed.

We first address Stengrund's argument that Stengrund's testimony regarding the snowstorm in mid-February 2019 should not have been conducted in a closed hearing because it had nothing to do with N.A.'s sexual history. We disagree. The purpose of the closed hearing under the rape shield statute is specifically for the court to consider whether to admit defendant's evidence related to the victim's past sexual behavior. Former RCW 9A.44.020(3). Stengrund does not cite any supporting authority that testimony directly related to laying the foundation or establishing the authenticity of the evidence, when challenged, must be conducted in a separate hearing. Where no authorities are cited in support of a proposition, we are not required to search out authorities, but may assume that counsel, after diligent search, has found none. Helmbreck v. McPhee, 15 Wn. App. 2d 41, 57, 476 P.3d 589 (2020) (citing DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

We next address Stengrund's argument that the court allowed legal argument to continue without an order explicitly re-opening the courtroom. Stengrund appears to refer to the portion of the hearing after lunch on July 24 when the State raised hearsay

objections related to exhibits Stengrund introduced prior to lunch that were text messages with family members. We need not determine whether such argument should have been conducted in a closed or open hearing because Stengrund fails to establish a factual basis for this court to consider his claim. The record establishes that the trial court expressly closed the hearing prior to lunch to take Stengrund's testimony related to the subject photographs of N.A. After lunch the court heard argument outside the presence of the jury but never similarly ordered that the post-lunch hearing was closed as it had prior to lunch. At one point the court stated "[t]his is not a rape shield hearing per se." After stating so, Stengrund did not further inquire, similarly as he had in previous hearings, as to whether the courtroom was now open.[4]

Notably, Stengrund does not present evidence that the courtroom was closed after lunch, but, instead, argues that the trial court "did not make a clear record of when the courtroom was re-opened to the public." While it is unclear from the record whether there were any other observers in the courtroom after the lunch hour, there is no indication that anyone was excluded. Nor is there any indication from the court that its pre-lunch order closing the courtroom to take Stengrund's testimony extended to the proceeding after lunch. A closure occurs when the courtroom is completely and purposefully closed to spectators. See State v. Lormor, 172 Wn.2d 85, 93, 257 P.3d 624 (2011). After lunch the court resumed to hear argument and trial resumed without any mention of having to reopen the courtroom. Stengrund has not presented a factual basis to warrant further review of this claim.

---

[4] The court previously held a closed hearing under the rape shield statute on July 19, 2023. During argument, after testimony was taken on that day, defense counsel asked if the hearing was still closed so that Stengrund's parents could come into the courtroom. The court responded that it was appropriate to reopen the courtroom.

Instagram Profile

Pre-trial, Stengrund moved to exclude under ER 404(b) any evidence suggesting he engaged in stalking behavior. This included evidence that he created a fake Instagram account to contact N.A. Stengrund argued that the evidence did not establish that the events occurred and, even if the court finds that they did, the State cannot prove that the admission falls under any exceptions in ER 404(b). The trial court denied the motion.

The admission or exclusion of evidence is in the discretion of the trial court, and such decision will be upheld absent an abuse of discretion, which may be found only when no reasonable person would have decided the same way. State v. Thomas, 150 Wn.2d 821, 869-70, 83 P.3d 970 (2004). ER 404(b) prohibits admission of evidence of other crimes, wrongs, or acts to prove a defendant has a criminal propensity. State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). ER 404(b) provides "it may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The list of permissible purposes for admitting evidence of a person's other acts is nonexclusive; "[t]he question to be answered in applying ER 404(b) is whether the bad acts are relevant for a purpose other than showing propensity." State v. Slocum, 183 Wn. App. 438, 456, 333 P.3d 541 (2014). In order for a trial court to admit evidence of past wrongs, ER 404(b) requires the trial court to

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the [permissible] purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevant evidence is admissible unless it is barred by the constitution, statute or other rules. ER 402.

The court conducted a hearing outside the presence of the jury to consider the motion. N.A. testified during this hearing that she believed communications between her and an individual using the Instagram profile "Corey_vette" was Stengrund. N.A. had blocked Stengrund from her social media accounts, including Instagram, and told him to not contact her. Later, a "Corey_vette" reached out to N.A. on Instagram and focused on her personal life and relationship with her then-boyfriend. N.A. had conversed with "Corey_vette" for quite a few months and around September 2020 told that person that N.A. planned to go to a specific casino in Anacortes with her boyfriend. Stengrund appeared at the same casino the same weekend. It was at this point that N.A. concluded that "Corey_vette" was Stengrund, whose favorite car is a Corvette. N.A. further testified, without objection, that one of Stengrund's roommates admitted to her that the Instagram profile at issue was actually Stengrund. Having considered all of N.A.'s testimony, the trial court found by a preponderance that the claimed conduct occurred and qualified as an "other act" under ER 404(b).

The State argues that the admission of evidence related to the "Corey_vette" Instagram account was not to show Stengrund had a propensity to rape N.A., but instead it was admitted to show his disregard for N.A.'s wishes, which was relevant to

20

show that their mid-March sexual encounter was nonconsensual. In considering the State's argument, the court found the purpose of motive as its reasoning for finding the Instagram account sufficient to be introduced. The court also determined that the probative value of the account outweighed the risk of unfair prejudice.

Stengrund first argues that there was no foundation for N.A.'s conclusion that "Corey_vette" was Stengrund. We disagree. The court was free to find N.A.'s testimony credible. Under the preponderance of evidence standard, the evidence was sufficient to support the court's conclusion that that the event occurred. Stengrund next argues that the evidence had no bearing on a "motive" for an alleged rape in March 2019. It does not follow that creating a fake Instagram account in order to continue communicating with N.A. after the rape was evidence that Stengrund had a motive to commit the rape. Nor is creating a fake Instagram account of consequence to the determination of whether it was more or less probable that N.A. consented to the anal sex. The State's argument that because Stengrund rejected N.A.'s pleas to leave her alone by making the fake Instagram account, it was more likely that he rejected her pleas to not have sex. This argument is closer to propensity evidence than evidence to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The State also argues for the first time on appeal that the evidence was admissible under res gestae.

Res gestae evidence, i.e., evidence that completes the story of the crime on trial by proving its immediate context of happenings near in time and place, is separate from evidence of "other acts" under ER 404(b). State v. Grier, 168 Wn. App. 635, 646, 278

P.3d 225 (2012). Res gestae evidence more appropriately falls within ER 401's definition of "relevant" evidence, which is generally admissible under ER 402. Id.

The State argues that discovery of the fake Instagram account is why N.A. decided to report the rape to the police despite the fact it was more than a year later. The State misconstrues the timeline established by the evidence. N.A. first reported to the police in July of 2020. N.A. testified that she did not figure out that "Corey_vette" was Stengrund until she saw him at the casino when N.A. took her boyfriend there for his birthday weekend in September of 2020. Thus, that could not have been the motivating factor why N.A. decided earlier to report the rape to the police. We conclude that the evidence related to the fake Instagram account was not relevant to prove an element of the crime charged or to rebut a defense. Thus, the evidence was not more probative than prejudicial.

The State argues that even if the admission of the evidence was error, it was harmless. We agree. Evidentiary error is grounds for reversal only if it results in prejudice, meaning "within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." Neal, 144 Wn.2d at 611. Improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole. Id.

The trial did not turn on just N.A.'s accusation and Stengrund's denial. Some of the most compelling evidence was Stengrund's own text messages that he admitted sending to N.A. after N.A. accused him of rape. Stengrund apologized for how it ended and said he was in the wrong. He said he should have listened to N.A. and to N.A.'s body language. Stengrund said his actions were not correct and that he acted out of a

sexual satisfaction. Though Stengrund testified at trial that the anal sex was consensual, Stengrund sent the apologies to N.A. to tell her what she wanted to hear so that he could move on with his life. But the text messages and testimony from Stengrund himself confirmed that he continued to contact N.A. for four months even after she asked him to leave her alone. This contradicts his testimony that he sent the text messages just so he could move on with his life. Though N.A. did not report the rape to police until July 2020, Stengrund, himself, admits that she accused him of rape after the incident in a text message soon after. The text messages also support that N.A. consistently did not want to have anything to do with Stengrund after the rape and that she threatened to contact the police if Stengrund did not leave her alone.

We conclude that any error in admitting the evidence related to the fake Instagram account was harmless.

Prosecutorial Misconduct

Stengrund claims several instances of prosecutorial misconduct, none of which he objected to during trial. Stengrund argues that a number of statements made by the prosecutor during closing arguments were improper and hindered his right to a fair jury trial.

Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard. State v. Brett, 126 Wn.2d 136, 174, 892 P.2d 29 (1995). To prevail, the defendant must establish that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

While a prosecutor has "some latitude to argue facts and inferences from the evidence," a prosecutor is not "permitted to make prejudicial statements unsupported by

the record." State v. Jones, 144 Wn. App. 284, 293, 183 P.3d 307 (2008) (citing State v. Weber, 159 Wn.2d 252, 276, 149 P.3d 646 (2006)); see also Miller v. Pate, 386 U.S. 1, 6-7, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967) (holding that a prosecutor commits misconduct by misrepresenting the facts in the record).

It is improper for a prosecutor personally to vouch for the credibility of a witness. Brett, 126 Wn.2d at 175 (citing State v. Sargent, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)). But prosecutors may argue inferences from the evidence, and prejudicial error will not be found unless it is "clear and unmistakable" that counsel is expressing a personal opinion. Id. Prosecutors have wide latitude to argue reasonable inferences from the facts concerning witness credibility. State v. Warren, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). Prosecutors may draw an inference from the evidence as to why the jury would want to believe one witness over another. Brett, 126 Wn.2d at 175. Arguing that a witness had no motive to fabricate his testimony is not impermissible vouching when the prosecutor is simply drawing inferences from the evidence at trial, not implying knowledge of facts outside the evidence or personally endorsing the witness. State v. Robinson, 189 Wn. App. 877, 893-94, 359 P.3d 874 (2015).

Similarly, it is improper to urge the jury to decide a case based on evidence outside the record. State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). But prosecutors are free to argue their characterization of the facts presented at trial and what inferences these facts suggest in closing argument. In re Pers. Restraint of Phelps, 190 Wn.2d 155, 167, 410 P.3d 1142 (2018). A jury instruction not to consider closing arguments as evidence further helps draw the line between fact and argument. Id. Juries are presumed to follow such instructions. Warren, 165 Wn.2d at 29.

If a prosecutor's statements are improper, this court determines whether the defendant was prejudiced under one of two standards of review. Emery, 174 Wn.2d at 760. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Id. If the defendant did not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. Id. at 760-61. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. Id. at 761.

The analysis, under this heightened standard, "focus[es] less on whether the prosecutor's misconduct was flagrant or ill-intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762. The inquiry is "whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection." State v. Walker, 182 Wn.2d 463, 478, 341 P.3d 976 (2015). This must be assessed in the "context of the total argument." Emery, 174 Wn.2d at 762 n.13.

A. *Vouching for the Victim*

Stengrund first argues that the State's repeated statements that N.A. did not have a personal interest or motive to "lie" or "make up" her testimony constituted vouching for the victim.

It is misconduct for a prosecutor to express a personal belief in the veracity of a witness. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion). Vouching occurs if a prosecutor either (1) places the prestige of the government behind the witness or (2) suggests that information not presented to the jury supports the witness' testimony. Robinson, 189 Wn. App. at 892-93. "But we will not find prejudicial error 'unless it is clear and unmistakable that counsel is expressing a personal opinion.'" State v. Emery, 161 Wn. App. 172, 192-93, 253 P.3d 413 (2011) (quoting Warren, 165 Wn.2d at 30)).

The challenged prosecutor statements must be considered in context. The challenged argument followed Stengrund's closing argument, where he attacked N.A.'s credibility by highlighting her testimony that her sexual relationship with Stengrund was over and comparing that with the admitted exhibits that included photographs of N.A. in her underwear that was sent to Stengrund after N.A. said the sexual relationship ended. Defense counsel said N.A. "wants to make a narrative. And maybe that's just who she is. She's an Instagram influence[r] and she just liked to run narratives."

In rebuttal, the prosecutor argued that "you have to think of all the things that would have to be true if she were lying." Including that she "lied" to her mother, sister, the police and defense counsel. Stengrund objected to the use of "to lying" and the trial court sustained the objection and instructed the jury to "disregard the use of the word 'lie.'" Afterwards, the prosecutor said: "to say that she's making all of this up for some narrative is an unreasonable doubt. To say that she made all of this up to her mother, that she made all of this up to her sister, that she made all of this up to Officer Figueroa, that she made all of this up to Detective Carter, that she made all of [it] up during her

26

defense interview with counsel, and that again, she got to the stand and made all of it up, and that the defendant's specific text messages about ignoring her body language are just a made-up apology to appease her."

In context, the prosecutor's statements were in response to the defense closing argument. Just as the defense highlighted evidence to raise questions about N.A.'s credibility, the prosecutor also highlighted evidence to support N.A.'s credibility. Specifically, the State asked the jury to consider various factors including quality of memory to the facts testified by both parties and the amount of detail given during their respective testimony. Prosecutors have a wide latitude to argue reasonable inferences from the facts concerning witness credibility and whether to believe one witness over another. Warren, 165 Wn.2d at 30; Brett, 126 Wn.2d at 175. Moreover, the prosecutor started its closing argument by reminding the jury "your instructions tell you how to assess testimony as well as the credibility of witnesses…" "…You are the ultimate judges of credibility in this case."

The prosecutor's remarks did not constitute improper vouching because they encouraged the jury to make credibility determinations based on the evidence, rather than asserting the prosecutor's personal belief as to the credibility of N.A. or Stengrund.

B. Defendant's Credibility

Stengrund also maintains that the prosecutor's argument that Stengrund was less credible because he was a defendant while also arguing that N.A. had no "motive to lie" was prejudicial misconduct.

During closing, the prosecutor argued how the jury could view Stengrund's testimony as being not credible:

You can look at the quality of the memory while Mr. Stengrund was testifying. You can consider the lack of detail. Generalized statements about lots of sex. Talked about sex in general terms. You can consider how he testified and think critically about it. How much of his statements came directly from him? How much of it came from coaching from his counsel? How much of it did he independently remember and offer on his own? When the defendant testifies, you have to weight [sic] that testimony against these factors. You presume him innocent, but you do no[t] have to presume him credible. It's up for you to decide.

In terms of personal interest, Mr. Stengrund has nothing but an incentive to lie. He's trying to avoid conviction to avoid –

The court sustained Stengrund's objection as to the use of the word "lie" and instructed

the jury to disregard the use of that word. The prosecutor continued:

The defendant has a personal interest in this case: to avoid a conviction, to avoid responsibility, to avoid accountability. Accountability he was willing to accept in March of 2019 when he thought no one but Natalie would read those text messages. He continue [sic] to contact her despite her repeated requests to stop, just like he continued to physically push despite her repeated requests to stop. He said he would not continue to associate with anyone who accused him of rape or such an absurd accusation, but his texts, those text messages are not consistent with someone who was so personally offended by an accusation of rape. His texts are consistent with and the reasonable inference from those texts is that he wanted to keep [N.A.] happy, friendly, keep a connection with her, make sure she did not report it. And what he said in those messages that you'll be able to read, that "I should have listened to your body language and not assumed anything."

On May 1st of 2019, he texted [N.A.] in one of those text messages that he deleted everything that he had of hers. He did not. He said he deleted her number, deleted the text message of his apology, but he kept the photos of her in her underwear. You have the exhibits that were admitted in this case and know that he was not telling the truth when he told [N.A.] that he deleted everything.

Defense objected, stating Stengrund is not on trial for possession of any conversations

with the complaining witness. The court overruled the objection. The prosecutor went

on:

You can assess his statements and what has been presented as evidence in this trial to know that he's not telling the truth. He held onto

those photos, held onto to those photos of her in her underwear if she ever decided to come forward.

He sat in this chair and testified about how many times she had consented to sex prior to the rape to present to all of you that because she had consented before and they had an ongoing relationship, she must have consented the night that this incident happened. That they had consensual sex before. But his text messages tell a different story because at the time in March 2019, before he was in front of all of you, he said because someone consented before doesn't mean you can assume consent.

And in considering corroboration, the defendant has no duty to present evidence in a criminal case. But you can consider which facets of his testimony are corroborated by other evidence. And, for example, his attempt to explain the apology in his text message is not corroborated. [N.A.'s] testimony, by contrast, has details about the rape. The quality of a witness's memory while testifying. She has no personal interest, no motive to lie. And it is corroborated by other independent evidence. Evidence independent from her own testimony, from other witnesses.

Stengrund relies on State v. Crossguns, 199 Wn.2d 282, 297-98, 505 P.3d 529 (2022), to support his argument that it is improper for the State to tell jurors they should determine if a witness is "lying" or "telling the truth." Crossguns holds that it is improper for the prosecutor to tell jurors it is their job to determine who was lying and who was telling the truth because the jury's role is to determine whether the State has proved the charge beyond a reasonable doubt. Id. But the record in the instant case does not support that the prosecutor ever told jurors it was their job to determine who was lying or telling the truth. The court instructed the jury that they could consider witnesses' motives, including their interest in the case outcome, when deciding credibility. Both sides discussed how the evidence could be viewed by the jury in its credibility determination.

Stengrund also specifically challenges the prosecutor's attack on Stengrund's credibility. He relies on State v. Hirata, 152 Haw. 27, 520 P.3d 225 (2022), and State v. Stotts, 26 Wn. App. 2d 154, 166-69, 527 P.3d 842 (2023). In Hirata, during closing

arguments, the prosecutor argued that the defendant had a "motive-to-lie," without presenting any evidence to support the claim other than the fact that Hirata was the defendant in the criminal case. The Hirata court held that because there were no specific facts or evidence to justify the prosecutor's credibility attack, it constituted misconduct. In Stotts, the prosecutor posed the question to the jury during closing arguments "I ask you to think about who has the personal interest in the outcome of this case…. And weigh that against what interest Mr. Stotts would have—in how this will affect his life." Stotts, 26 Wn. App. 2d at 161-62 (2023). The court held that it is improper vouching for a prosecutor to argue that law enforcement witnesses would not risk their career by testifying untruthfully.

Both cases are distinguishable. Stotts is factually distinguishable as it addressed vouching for law enforcement witnesses arguing they would not lie because it would risk their career. Stotts is inapposite. In Hirata, no curative instruction was given. But in the instant case the jury was directed to disregard the prosecutor's use of the term "lie." Also, unlike the prosecutor in Hirata, the prosecutor in the instant case drew the jury's attention to evidence it could rely on to question Stengrund's credibility and did not just rely on the fact he was a defendant in a criminal case.

*C. Coached by the Attorney*

Stengrund next contends that the State's remarks about him being coached by his attorney was improper. The State concedes that the "coaching" statement was improper but argues that the statement was not so flagrant and ill-intentioned that it was not curable with an instruction. We agree.

Misconduct occurs if the State "impugn[s] the role or integrity of defense counsel.... Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." State v. Cook, 17 Wn. App. 2d 96, 109-10, 484 P.3d 13 (2021) (misconduct to contrast forensic interviewer's role with defense counsel's role not to look for truth).

Stengrund relies on State v. Lindsay, 180 Wn.2d 423, 437, 326 P.3d 125 (2014), to argue that reversal is warranted. In Lindsay, the prosecutor was accused of several instances of misconduct including impugning the integrity of defense counsel in the case, expressing personal opinions on the defendant's credibility during closing arguments, and making inaudible statements to the jury. Our Supreme Court reversed the conviction because of the pervasive nature of the prosecutor's behavior throughout the trial. Id. at 444. The instant case, however, is more analogous to State v. Carte, 27 Wn. App. 2d 861, 870, 534 P.3d 378 (2023), review denied, 542 P.3d 569 (2024).

In Carte, the prosecutor made a single improper "generic tailoring" argument, suggesting that the defendant could have conformed his testimony to the evidence presented during the trial. Id. at 873. The Carte court assessed the pervasiveness of the alleged misconduct and concluded that while the prosecutor's argument was lengthy, a timely curative instruction would have abated potential prejudice of the individual improper statement that was never repeated. Id. at 875.

Like the prosecutor in Carte, the prosecutor in the instant case made a one-time improper statement at the outset of a lengthy closing argument. Had Stengrund objected, the trial court would have provided curative instructions to the jury. Jurors are presumed to follow the court's instructions. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d

1192 (2013); Kirkman, 159 Wn.2d at 928. Stengrund's failure to object deprived the trial court of an opportunity to remedy any potential error. See Carte, 27 Wn. App. 2d at 874. Because the prosecutor's statement was not so flagrant and ill-intentioned such that it was not curable with an instruction, Stengrund has waived this prosecutorial misconduct claim. State v. Taylor, 29 Wn. App. 2d 319, 335-36, 541 P.3d 1061 (2024), review denied, 549 P.3d 116 (2024).

D. "Me Too Movement"

Stengrund next argues that the State's closing argument remarks about a young woman having the ability to invite a friend into their bedroom without fear of being raped was a direct reference to the recent "Me Too, Movement" that became widely publicized on social media.

Prosecutorial misconduct occurs when the State turns a criminal case into a referendum on a broader political issue such as the "war on drugs." See State v. Loughbom, 196 Wn.2d 64, 70-78, 470 P.3d 499 (2020).

In its closing, the prosecutor asked the jury to evaluate the evidence "with an open mind free of bias or prejudice." In relation to that instruction, the State stated "In our society, we are accustomed to expecting different things from wom[e]n," and that bias may include wondering why she invited "this man into her bedroom…or was she sending some sort of unspoken signal of wanting sex by laying down on her own bed." The State continued:

> Instead, I'm asking that you think rationally and critically about the evidence in this case. This is 2019. A young woman in 2019 can continue to develop a friendship that had once been a sexual relationship without risking physical violence and rape. In 2019, a woman can invite a man to her house without risking physical violence and rape. In 2019, a woman is

allowed to say no, even if she was in a sexual relationship with that person previously.

The prosecutor did not reference the "Me too Movement" in closing argument. The prosecutor did ask the jury to think reasonably about the expectations of women in today's society. The prosecutor argued that a woman should have the right to maintain a friendship with a former sexual partner without facing the risk of sexual assault, and is allowed to say no, even if there was a history of sex with that person. These arguments were reasonable inferences made based on facts admitted at trial. The State's closing argument focused on the broader issue of consent and the reasonable inferences to be drawn from the evidence. The prosecutor's statements were not improper.

Ineffective Assistance of Counsel

Stengrund contends that his counsel was ineffective for failing to object to the prosecutor's improper statements during closing argument as alleged above.

A person accused of a crime has the right to effective assistance of counsel. U.S. Const. amends. VI & XIV; Const. art. I, § 22; Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). While counsel is not expected to perform flawlessly, counsel must meet an objectively reasonable minimum standard of performance. Id. at 688.

If the defendant can show that the failure to object was not a legitimate trial strategy and that the objection would have been sustained, then the failure to object may be considered deficient performance. State v. Stotts, 26 Wn. App. 2d 154, 166, 527 P.3d 842 (2023). A defendant who claims that he received ineffective assistance of counsel must show both that (1) defense counsel's representation was deficient, and (2)

the deficient representation prejudiced the defendant. State v. Vazquez, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021).

We do not address both prongs of the ineffective assistance test if the defendant's showing on one prong is insufficient. Strickland, 466 U.S. at 697. We give great judicial deference to trial counsel's performance and we begin our analysis with a strong presumption that counsel was effective. Id. at 689; State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

To satisfy the prejudice prong of the Strickland test, the defendant must establish that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 669; State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). "In assessing prejudice, 'a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law' and must 'exclude the possibility of arbitrariness, whimsy, caprice, 'nullification' and the like.'" State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting Strickland, 466 U.S. at 694-95).

Even assuming, without deciding, defense counsel was deficient for not objecting to the prosecutor suggesting Stengrund was coached by his attorney, Stengrund fails to present any argument as to how he was prejudiced. Thus, his ineffective assistance of

counsel claim fails.

We affirm.

_____ Cohen, J.

WE CONCUR:

_____
Birk, J.

_____
Brennan, J